UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 08-CR-59-CVE |
| ) | |
| EDUARDO CARVAJAL-MORA ) | |
| a/k/a Eduardo Carbajal-Mora, ) | |
| ) | |
| Defendant. ) | |

**OPINION AND ORDER**

Now before the Court is Defendant's Motion to Suppress Evidence (Dkt. # 20). Defendant asserts that police lacked reasonable suspicion to conduct a traffic stop of his vehicle on October 24, 2007, and that evidence seized in a subsequent search of his vehicle should be suppressed.

**I.**

Detective Quinn Turner ("Turner") works in a drug interdiction unit for the St. Louis County Police Department in Missouri and he also served on a Drug Enforcement Agency ("DEA") task force. He testified that Interstate 44 ("I-44") is a known corridor for drug couriers and, on October 24, 2007 around 6:00 a.m., he was conducting random hotel checks along I-44. When performing a spot check at a hotel, he would check the license plates of cars in the parking lot to see if any license plates were from source states such as Texas, Arizona, New Mexico, Mexico, or Canada. Turner stopped at a Super 8 Motel in St. Clair, Missouri near I-44 and State Highway 47. After talking to the clerk, he learned that one guest had checked in late and paid with cash. The clerk gave Turner the name and address provided by the guest and also identified the guest's vehicle. The

guest's name was Eduardo Carvajal ("Carvajal")[1] and he drove a Ford F-250 Super Duty King Ranch pickup truck ("F-250"). Turner checked Carvajal's criminal history in the Narcotics and Dangerous Drugs Information System ("NADDIS") and the National Criminal Information Center ("NCIC") databases. He discovered that Carvajal was a deportable alien due to a 1992 conviction, and that the DEA had an open investigation of Carvajal for cocaine trafficking. The information Turner received contained a caution that defendant could be armed and dangerous.

After conducting a criminal history check of Carvajal, Turner examined Carvajal's vehicle and observed several things that suggested Carvajal was engaged in drug trafficking. Turner noticed that the F-250 with an Oklahoma license tag was parked on the opposite side of the parking lot from the motel and backed up against a fence. This suggested that the driver was attempting to obscure the license tag from view. A motorcycle with a California license tag was secured to the bed of the F-250 and Turner also considered this an indication that illegal activity may be occurring. Based on his experience, drug traffickers often placed legitimate items on a truck bed to camouflage contraband hidden underneath. He also found it unusual that a vehicle traveling from east to west would be carrying a motorcycle with a California tag. This implied that the motorcycle was purchased in California and had already been carried across the country from west to east. In addition, Turner observed that the F-250 was registered to a Daniel Lopez in Broken Arrow, Oklahoma, while the motorcycle was registered to a Daniel Lopez in Long Beach, California. These indicators led Turner to believe that drug trafficking activity was occurring.

---

[1] The Court notes that defendant was indicted as Eduardo Carvajal-Mora. However, the evidence presented at the suppression hearing showed that defendant was using the name Eduardo Carvajal on October 24, 2007. To maintain consistency with the evidence presented at the suppression hearing, the Court will refer to defendant as Eduardo Carvajal in this Opinion and Order.

Turner began surveillance of the F-250, but he made several phone calls while he was waiting for Carvajal to leave the Super 8. Turner called Phelps County Sheriff's Department Deputy Carmelo Crivello ("Crivello") to notify him that the vehicle may be headed through Phelps County on I-44 and requested his assistance. Turner asked Crivello to "make his own case" and initiate a traffic stop of the F-250 if he saw a traffic violation. Turner called Jeff Othic ("Othic") at Immigration and Customs Enforcement ("ICE") to determine Carvajal's immigration status. Othic advised Turner to detain Carvajal as a deportable alien if he could confirm Carvajal's identity. Turner also notified DEA agent Brian Witek ("Witek") about his investigation and kept in touch with Witek throughout the morning.

At 11:15 a.m., Carvajal and an unknown female entered the F-250 and began driving west on I-44. Turner followed the F-250 in an unmarked unit and had a clear view of the F-250. Crivello was waiting at mile marker 198 in a marked police car. He testified that he was parked in a gravel median between the eastbound and westbound of lanes of I-44 and he was facing oncoming traffic from the west. Crivello observed the F-250 pass his position and began following the vehicle to see if a traffic violation occurred. According to the testimony of Turner and Crivello, I-44 is two lane highway in each direction. The F-250 was driving in the right lane and Crivello was a short distance behind in the left lane.[2] Turner was approximately 100 to 300 meters behind the F-250 in the left lane and Crivello was between Turner and the F-250. Both Turner and Crivello saw the F-250 cross

---

[2]   There is an inconsistency in the testimony of Turner and Crivello on this point: Turner testified Crivello was in the right lane; Crivello testified that he was in the left lane.

onto the shoulder of the road from the right lane.[3] Turner recalls hearing a sound as the F-250 ran over rivets or indentations on the fog line or shoulder, but Crivello could not recall if he heard a similar sound.[4] Crivello testified that failure to maintain a single lane is a traffic offense under Missouri law, so he turned on his emergency lights to initiate a traffic stop.

The F-250 pulled onto the shoulder on the right side of the road and Crivello parked behind him. Turner had previously advised Crivello that Carvajal could be armed and dangerous, and Crivello waited for Turner to arrive before making contact with the driver. Turner arrived within a few seconds and both men approached the F-250. Crivello made contact with the driver while Turner observed. Crivello explained to the driver that he had observed a traffic violation and he asked the driver to sit in his patrol car.[5] Upon request from Crivello, Carvajal produced his driver's license. Crivello looked at the license and handed it to Turner. Turner confirmed that the name, address, and date of birth matched those provided by NADDIS and NCIC and, at this point in the encounter, he determined that he would detain Carvajal pursuant to the ICE hold. However, Turner did not immediately take Carvajal into custody.

Crivello asked Carvajal about this travel plans. Carvajal stated that he had visited Chicago, Illinois to "vacation and party" with friends and he was returning home to Tulsa, Oklahoma.

---

[3]  Crivello testified that the line separating the right lane and the shoulder is called a "fog line." In this Opinion and Order, the Court may refer to the boundary between the right lane and the shoulder as the fog line when considering whether a traffic violation occurred.

[4]  Crivello stated that he conducts anywhere from two to ten traffic stops every day and he does not recall every detail of each particular traffic stop.

[5]  There is an inconsistency in the testimony of Turner and Crivello concerning defendant's location during the initial part of the traffic stop: Crivello testified that he talked to defendant in his patrol car; Turner testified that Crivello was talking to Carvajal outside of Crivello's patrol car while Turner stood at the rear of the F-250.

Crivello also asked Carvajal if he had ever been arrested, and Carvajal claimed that he not been arrested. Crivello knew from Turner's background check that this was untrue. While Crivello was talking to Carjaval, Witek arrived on the scene and began a conversation with the female passenger. The passenger's name was Crystal Chappell ("Chappell"). Witek asked Chappell to step out of the vehicle and he asked about the purpose of her trip. Chappell claimed that she and Carvajal had visited Chicago to "vacation and party," but she stated that they were headed home to Springfield, Missouri. The simple and generic story, combined with the inconsistencies between Carvajal's and Chappell's statements about their destination, suggested to Turner that Carvajal and Chappell might be engaged in illegal activity.

Crivello asked Carvajal for consent to search the vehicle and Crivello testified that Carvajal voluntarily consented. Carvajal was not under arrest when he was asked to consent but Crivello was clear that neither Carvajal nor Chappell was free to leave. Crivello testified that his request for consent came up in the normal flow of conversation and he did not make any show of force when consent was requested. He acknowledged that he had not informed Carvajal of his Miranda rights before he asked for consent and, although Carvajal had not formally been arrested, he considered Carvajal to be in custody. Crivello did not inform defendant of his right to refuse consent nor did Crivello ask Carjaval to sign a written consent form. Carvajal did not make any statements limiting the scope of his consent.

Crivello and Witek began to search the vehicle and Crivello noticed that the airbag compartment on the driver's side appeared to be glued in place. Crivello found it unusual that a relatively new vehicle would have a damaged air bag compartment and he suspected that it could be a hidden compartment for contraband. In fact, he believed that this was a "sloppy" attempt to

disguise a hidden compartment. He could not see into the compartment, but he used a tool to pry open the air bag compartment. When Crivello peeled back the cover of the compartment, he saw bundles of currency.[6] Turner testified that Carvajal was arrested due to his status as a deportable alien. Crivello testified that, even if Crivello had not searched the vehicle after the drug stop, Carvajal would have been arrested as a deportable alien and the cash would have been found in an inventory search of the F-250.

## II.

Defendant challenges the legality of the traffic stop and his subsequent arrest under the Fourth Amendment to the United States Constitution. Defendant argues that Crivello lacked reasonable suspicion to initiate a traffic stop and the traffic stop was pretextual. He also argues that he did not voluntarily consent to a search of his vehicle and, even if he did consent, he did not specifically authorize Crivello to open compartments within the vehicle. The government opposes each of defendant's arguments and, as an alternative basis to uphold the search, argues that it would have discovered the same evidence through an inventory search of the vehicle following defendant's arrest as a deportable alien.

Traffic Stop

A traffic stop is treated as an investigative detention, and such a stop is governed by the standards set forth in Terry v. Ohio, 392 U.S. 1 (1968). United States v. Bradford, 423 F.3d 1149, 1156 (10th Cir. 2005). When determining the reasonableness of a traffic stop, the Court must make

---

[6]  Defendant suggests that the currency was found during a subsequent inventory search of the F-250, but he presented no evidence supporting this theory. There is uncontradicted testimony, however, that the bundles of currency were not removed from the vehicle until after it had been moved to a safe location.

two separate inquiries. First, did the police officer have a valid reason for initiating the traffic stop. United States v. Botero-Ospina, 71 F.3d 783, 787 (10th Cir. 1995). "[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has a reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." Id. Second, a traffic stop must not become an unnecessarily lengthy detention, but must be limited in scope to the purpose of the initial traffic stop. United States v. Rice, 483 F.3d 1079, 1083 (10th Cir. 2007). A police officer may extend the length of the traffic stop for questioning beyond the initial purpose of the traffic stop only if the officer has "an objectively reasonable and articulable suspicion that illegal activity has occurred, or the driver voluntarily consents to further questioning." United States v. Ramirez, 479 F.3d 1229, 1243 (10th Cir. 2007).

Defendant claims that he did not commit a traffic violation by drifting over the fog line and cites United States v. Gregory, 79 F.3d 973 (10th Cir. 1996), for support. In Gregory, the Tenth Circuit held that an isolated incident of crossing into the emergency lane did not violate Utah law and relied on a decision by the Utah Court of Appeals to support this interpretation of Utah Ann. Code § 41-6-61(1). Id. at 978 (citing State of Utah v. Bello, 871 P.2d 584, 586 (Utah Ct. App. 1994)). Here, the government cites a Missouri statute providing that a vehicle should be operated in the right-hand lane of a road except under specified circumstances. See MO. REV. STAT. § 304.015 (2007). The relevant part of the statute provides:

> 5. Whenever any roadway has been divided into three or more clearly marked lanes for traffic, the following rules in addition to all others consistent herewith shall apply:
>
> (1) A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety.

Id. at § 304.015(5)(1).  The Missouri Court of Appeals has held that "[w]eaving within the lane of traffic in which a vehicle is traveling provides a sufficient basis for an investigatory stop of a motor vehicle."  State v. Malaney, 871 S.W.2d 634, 637 (Mo. Ct. App. 1994).

Turner and Crivello testified that they had a clear view of defendant's vehicle and they observed the vehicle cross over the fog line two or three times.  Turner stated that he was approximately 100 to 300 yards behind defendant's vehicle and there was relatively little traffic on I-44.  He observed the tires on the right side of the vehicle cross the fog line three times and he heard a sound when the vehicle drove over rivets or indentations on the shoulder.  Crivello observed defendant's vehicle drift onto the shoulder two or three times but he does not remember hearing a sound when this occurred.  He testified that this was a traffic violation under Missouri law and he initiated the traffic stop at mile marker 195.[7]

The Court finds that Turner's and Crivello's testimony was credible and reliable,[8] and Crivello had an articulable reasonable suspicion that defendant committed a traffic violation. Crivello testified that defendant's vehicle left the road two or three times, and his testimony is

---

[7]   Defendant's counsel asked Crivello several questions implying that Crivello felt pressure to find a traffic violation before defendant left Phelps County.  Crivello testified that Phelps County extends from mile marker 200 to 169 in the westbound direction on I-44, and he picked up defendant's vehicle at mile marker 198.  When Crivello pulled defendant over at mile marker 195, he had 26 miles remaining before defendant left Phelps County.  Even if it were relevant, this does not suggest that Crivello needed to create a reason for a traffic stop, because he had a significant amount of time remaining before defendant left Phelps County.

[8]   The Court has noted two inconsistencies in the testimony of Turner and Crivello (Crivello's lane before the traffic stop and whether defendant was seated in Crivello's patrol car, see notes 2 and 5, supra).  These points are relatively minor and do not affect the Court's analysis of the legal issues raised by defendant. Coupled with the fact that over six months have passed since the traffic stop, these minor differences do not detract from the overall credibility and reliability of Turner's or Crivello's testimony.

corroborated by Turner. Defendant's reliance on Gregory is misplaced, because Gregory has no bearing on whether a traffic violation occurred under Missouri law. The Missouri statute and credible testimony support the finding that defendant committed a traffic violation under Missouri law. In addition, the Tenth Circuit found mitigating circumstances in Gregory that supported the driver's innocent explanation of the traffic offense. Gregory, 97 F.3d at 978 (the defendant was driving on a twisting mountain road in windy weather and a single incidence of crossing the fog line was insufficient to support finding of traffic violation under Utah law). There are no such mitigating circumstances here and defendant crossed the fog line multiple times. Even if the Court were to apply Gregory, the Court would find that Crivello had reasonable suspicion to conduct a traffic stop.[9]

Under the second prong of Terry, the Court finds that the length of the traffic stop was reasonable. An officer conducting a traffic stop may request a driver's license, vehicle registration, run a computer check, and issue a citation. See United States v. Zubia-Melendez, 263 F.3d 1155, 1161 (10th Cir. 2001). An officer may also "ask questions about the motorist's travel plans and authority to operate the vehicle" in addition to obtaining the relevant documentation. United States v. Alcaraz-Arellano, 441 F.3d 1252, 1258 (10th Cir. 2006). According to Turner, the traffic stop lasted approximately ten minutes from the time of the stop to defendant's arrest and Crivello's testimony suggests it may have been shorter. Crivello asked defendant to produce his license and

---

[9] Defendant also suggests that the traffic stop was pretextual. He argues that he was pulled over for a minor traffic violation that did not affect public safety and Turner was looking for an excuse to search his car. Even if police had other motives for initiating a traffic stop, such as to search defendant's vehicle for contraband, the subjective motivations of police are irrelevant and police could initiate a stop after observing a traffic violation. Whren v. United States, 517 U.S. 806 (1996); United States v. Botero-Ospina, 71 F.3d 783, 787 (10th Cir. 1995).

the vehicle's registration and return with Crivello to his patrol car. He also asked defendant questions about his travel plans and criminal history. Defendant consented to a search of the vehicle and, even if the search exceeded the scope of the initial traffic stop, defendant's consent permitted them to extend the length of the detention without violating the Fourth Amendment. There is no evidence that the traffic stop was a lengthy detention or that Turner or Crivello exceeded the scope of the traffic stop, and the length of the detention is not a basis to suppress evidence in this case.

Consent

Defendant argues that he did not voluntarily consent to a search of his vehicle. He also claims that Crivello exceeded the scope of the consent by prying open a panel without specific authorization from defendant. The government presented evidence that Crivello asked for defendant's consent in a conversational manner without any threat of force. Defendant does not challenge the voluntariness of his consent based on alleged show of force or the number of police officers present. Instead, defendant argues that he was not informed of his right to refuse consent and Crivello did not ask defendant to sign a consent form. Defendant also argues that he was in custody when Crivello asked for consent and Crivello did not inform defendant of his Miranda rights before asking for consent.

The general rule is that warrantless searches violate the Fourth Amendment, but there are several exceptions to this rule. United States v. Lyons, 510 F.3d 1225, 1239 (10th Cir. 2007). The government has the burden to prove that an exception to the warrant requirement applies. United States v. Maestas, 2 F.3d 1485, 1491 (10th Cir. 1993). "A valid search may be made of a vehicle without a warrant or probable cause when a person in control of the vehicle has given his voluntary

consent to search." United States v. Santurio, 29 F.3d 550, 552 (10th Cir. 1994). In Zubia-Melendez, the Tenth Circuit stated:

> Whether voluntary consent was given is a question of fact, determined by the totality of the circumstances . . . . We have utilized a two-part test to make this determination: "First, the government must proffer 'clear and positive testimony that consent was unequivocal and specific and freely given.' Furthermore, the government must prove that this consent was given without implied or express coercion."

263 F.3d at 1162 (internal citations omitted).

Under the totality of the circumstances, the Court finds that defendant voluntarily consented to a search of his vehicle. Crivello testified that he asked defendant if he would consent to a search of his vehicle and it was clear that defendant voluntarily gave his consent for the search. Both Crivello and defendant were seated in the patrol car and Crivello did not use any threat of force to obtain consent. Defendant claims that he was not advised that he could refuse to consent, but Crivello was not required to inform defendant of his right to refuse. Schneckloth v. Bustamonte, 412 U.S. 218, 232-33 (1973); Zubia-Melendez, 263 F.3d at 1163. Crivello did not ask defendant to sign a consent form, but the Court has found no authority suggesting that a police officer's failure to use a consent form suggests that a defendant's consent was involuntary. Crivello testified that defendant was in custody when he asked for consent and he admitted that he did not give defendant a Miranda warning before seeking consent. However, this does not vitiate defendant's consent as long as defendant voluntarily consented under the totality of the circumstances. United States v. Renken, 474 F.3d 984, 988 (7th Cir. 2007); United States v. Rodriguez, 464 F.3d 1072, 1078 (9th Cir. 2006); United States v. Dozal, 173 F.3d 787, 796 (10th Cir. 1999). Without evidence that defendant's consent was obtained with coercion, the Court finds that defendant's motion to suppress should be denied as to the voluntariness of his consent.

Defendant also argues that Crivello exceeded the scope of defendant's consent by prying open the airbag compartment. "[T]he scope of a consent search is limited by the breadth of the consent given." United States v. Pena, 920 F.2d 1509, 1514 (10th Cir. 1990). To determine the scope of consent, a court must consider what "a reasonable person would have understood by the exchange between the defendant and police officer." United States v. Patten, 183 F.3d 1190, 1194 (10th Cir. 1990). "The general rule is that 'when a suspect does not limit the scope of a search, and does not object when the search exceeds what he later claims was a more limited consent, an officer is justified in searching the entire vehicle." United States v. Contreras, 506 F.3d 1031, 1037 (10th Cir. 2007) (quoting United States v. West, 219 F.3d 1171, 1177 (10th Cir. 2000)).

In two unpublished decisions, the Tenth Circuit has found that a police officer did not exceed the scope of the defendant's consent by opening the airbag compartment during a vehicle search. United States v. Torres, 176 Fed. Appx. 915, 917-18 (10th Cir. April, 11 2006); United States v. Sillas-Cebreros, 148 Fed. Appx. 684, 688 (10th Cir. Aug. 30, 2005).[10] This is consistent with other Tenth Circuit decisions holding that consent to search a vehicle permits a search of the entire vehicle, including any location where a police officer believes contraband may be hidden, unless the defendant limits the scope of his consent. Lyons, 510 F.3d at 1239; Contreras, 506 F.3d at 1037; United States v. Marquez, 337 F.3d 1203, 1209 (10th Cir. 2003); United States v. Ramstad, 308 F.3d 1139 (10th Cir. 2002). Defendant did not limit the scope of his consent, and Crivello could reasonably assume that defendant consented to a search of the entire vehicle. Therefore, Crivello

---

[10]  Unpublished decisions are not precedential, but may be cited for their persuasive value. Fed. R. App. 32.1; 10th Cir. R. 32.1.

did not exceed the scope of defendant's consent, and defendant's motion to suppress is denied on this issue.

Inevitable Discovery

The government argues that it would have discovered the currency hidden in the airbag compartment pursuant to a lawful inventory search and, even if a Fourth Amendment violation occurred, defendant's motion to suppress should be denied. "The inevitable discovery doctrine provides an exception to the exclusionary rule and permits evidence to be admitted if an independent, lawful police investigation inevitably would have discovered it." United States v. Martinez, 512 F.3d 1268, 1273 (10th Cir. 2008) (quoting United States v. Cunningham, 413 F.3d 1199, 1203 (10th Cir. 2005)). The government may prove inevitable discovery by showing that evidence would have been seized in a lawful inventory search of a vehicle following a defendant's arrest. Id. at 1273; United States v. Teller, 349 F.3d 1239, 1243 (10th Cir. 2003); United States v. Haro-Salcedo, 107 F.3d 769, 773 (10th Cir. 1997); United States v. Ibarra, 955 F.2d 1405, 1410 (10th Cir. 1992). In this case, defendant was a deportable alien and he was arrested on that ground. Even if the Court were to assume that Crivello exceeded the scope of defendant's consent by prying open the airbag compartment, Crivello testified that defendant would have been arrested on October 24, 2007 due to his status as a deportable alien and his vehicle would have been subjected to an inventory search. Pursuant to a lawful inventory search, the contraband in the F-250 would inevitably have been discovered, and this is an alternate basis to deny defendant's motion to suppress.

**IT IS THEREFORE ORDERED** that Defendant's Motion to Suppress Evidence (Dkt. # 20) is **denied**.

14

**DATED** this 7th day of May, 2008.

                                                                                                                         _\[signature\]_
                                                                                                         CLAIRE V. EAGAN, CHIEF JUDGE
                                                                                                         UNITED STATES DISTRICT COURT